COURT OF APPEALS
DECISION
DATED AND FILED

September 22, 2022

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2021AP1861-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2018CF432

IN COURT OF APPEALS
DISTRICT IV

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

MICHAEL J. O'BRIEN,

DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Columbia County: TODD J. HEPLER, Judge. *Affirmed*.

Before Blanchard, P.J., Kloppenburg, and Graham, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1      PER CURIAM. In this appeal, Michael O'Brien challenges his judgment of conviction for first-degree reckless homicide by drug delivery and the circuit court's denial of his postconviction motion, which sought to withdraw his no-contest plea to that charge. O'Brien argues that he should be able to withdraw his plea because he received ineffective assistance of counsel—specifically, that his trial counsel performed deficiently by failing to thoroughly investigate a potential defense, and by failing to correctly or adequately advise O'Brien regarding that defense before he entered his plea. O'Brien asserts that, had he known that he had a compelling defense to the homicide charge, he would have gone to trial instead of accepting the plea deal offered by the State. We conclude that O'Brien has not met his burden to prove that his trial counsel's performance was deficient, and accordingly, that O'Brien is not entitled to withdraw his plea. We therefore affirm the judgment of conviction and the order denying O'Brien's postconviction motion.

## BACKGROUND

¶2      This case arises from the death of K.J., who died of a drug overdose after consuming a drug mixture allegedly sold to her by O'Brien. K.J. was last seen alive on September 2, 2018, and her deceased body was discovered in her apartment two days later.[1]

¶3      During the ensuing investigation, law enforcement officers discovered a paper bindle in K.J.'s purse containing a tan powdery substance wrapped in a Menard's receipt. The parties appear to agree that officers linked

---

[1] Although not statutorily required, we follow the parties' lead in referring to the homicide victim by her initials.

O'Brien to the bindle through the Menard's receipt and, although this fact is not confirmed by anything in the record, we will accept it as true for purposes of this appeal. Going forward, we refer to the bindle found in K.J.'s purse as the "O'Brien bindle."

¶4      The officers also discovered two text message conversations between K.J. and a phone number linked to O'Brien. In both conversations, which occurred on September 1 and September 2, 2018, K.J. arranged to meet someone at the Portage Walmart for what appeared to be a drug deal. Video surveillance footage from those dates showed K.J. making brief contact with a man in a vehicle that matched O'Brien's pick-up truck. In the footage from September 2, K.J. was wearing the same clothing that she was wearing when she died.

¶5      An officer interviewed O'Brien and told him that law enforcement suspected K.J. had died from consuming a drug mixture that O'Brien provided to her. According to the officer, O'Brien nodded in apparent agreement. He said that he had known K.J. for several months, that she learned of his "drug history," and that at some point she began asking him for drugs. O'Brien admitted that K.J. "hit him up" for heroin a couple times shortly before her death, and that the resulting transactions occurred in his truck in the Portage Walmart parking lot. He estimated that he had sold K.J. $20 worth of heroin the first time and $40 worth of heroin the second time. O'Brien said that he had originally purchased the drugs for himself, and that he did not know what the drugs had been cut with.

¶6      The State charged O'Brien with two counts of distributing a controlled substance in violation of WIS. STAT. § 961.41(1)(a)[2] and one count of

---

[2] All references to the Wisconsin Statutes are to the 2019-20 version.

first-degree reckless homicide by drug delivery in violation of WIS. STAT. § 940.02(2)(a). Counsel was appointed to represent O'Brien in the proceedings related to these charges.

¶7    Ultimately, O'Brien entered a plea agreement with the State pursuant to which he pled no contest to the homicide charge and the State dismissed the remaining charges.

¶8    Following his conviction, O'Brien retained a toxicologist and filed a postconviction motion to withdraw his plea due to ineffective assistance of counsel. Relying on the toxicologist's opinion, O'Brien asserted that he would have had a convincing defense to the homicide charge based on several discrepancies between the drugs found in the O'Brien bindle and those found in K.J.'s postmortem blood and urine.

¶9    Specifically, the powdery substance in the O'Brien bindle contained a mixture of fentanyl, heroin, cocaine, and tramadol, but not all of those substances were found in the lab tests of K.J.'s postmortem blood and urine. Fentanyl was found in the bindle and in K.J.'s blood and urine, but the O'Brien bindle also contained cocaine and tramadol, neither of which were present in K.J.'s blood or urine. O'Brien's toxicologist's report noted the presence of heroin in the O'Brien bindle, but the toxicologist did not comment on whether that result was consistent with the lab reports of K.J.'s blood and urine.[3] Finally, K.J.'s

---

[3] The lab reports indicate that K.J.'s blood and urine were not tested for the presence of heroin. In their submissions to the circuit court and this court, the parties do not comment on whether her blood and urine were tested for any metabolite of heroin, nor do the parties comment on the significance of any such results.

postmortem blood tested positive for methadone, gabapentin, and marijuana (THC), but the O'Brien bindle did not contain those substances.

¶10     According to O'Brien's postconviction motion, the discrepancies between the drugs in the O'Brien bindle and those in K.J.'s postmortem blood and urine could have caused a jury to have reasonable doubt about his guilt.  By way of background, to secure a conviction against O'Brien, the State would be required to prove, among other things, that K.J. consumed drugs that were delivered to her by O'Brien and that she died as a result.  *See* WIS. STAT. § 940.02(2)(a); WIS JI—CRIMINAL 1021.   To that end, the State would have to prove that K.J.'s consumption of O'Brien's drugs was a "substantial factor" in causing her death, but would not have to prove that the consumption of O'Brien's drugs was the sole cause of her death.  *See* WIS JI—CRIMINAL 1021.

¶11     In his postconviction motion, O'Brien argued that the O'Brien bindle "supplied the main tie" linking him to K.J.'s death and that, based on the lab reports, a jury could reasonably conclude that K.J. did not consume, or did not die as a result of consuming, the substance in the O'Brien bindle.   O'Brien asserted that his trial counsel failed to adequately investigate or advise him of this potential defense and that, had O'Brien known of the defense, he would have gone to trial instead of accepting the plea agreement offered by the State.[4]

---

[4] In his postconviction motion, O'Brien also argued that his trial counsel met with him just once in person and failed to return his phone calls, and further, that counsel misadvised him regarding the sentence he would likely receive if he took the plea deal offered by the State.  The circuit court made findings of fact that were unfavorable to these arguments, and O'Brien does not explicitly renew them on appeal.  To the extent that his appellate briefing alludes to these additional arguments, we disregard them as unsupported and undeveloped, and we address them no further.  *See State v. Pettit*, 171 Wis. 2d 627, 646-47, 492 N.W.2d 633 (Ct. App. 1992) (we need not consider undeveloped arguments).

¶12     The circuit court held a ***Machner*** hearing[5] at which the toxicologist retained by O'Brien, his trial counsel, and O'Brien all testified.

¶13     In his testimony, the toxicologist confirmed that there were several discrepancies between the drugs found in the powdery substance in the O'Brien bindle and those found in K.J.'s postmortem blood and urine.  He opined that K.J. died of a mixed drug toxicity, meaning that the four drugs discovered in her postmortem blood (fentanyl, methadone, gabapentin, and marijuana) combined in a "synergistic fashion" to cause respiratory arrest and death.  According to the toxicologist, it was not medically possible to determine which particular drug caused her death, and all four drugs may have individually or collectively been responsible.  This testimony was also consistent with the toxicologist's written report, which stated that it was not possible as a matter of medical science to determine whether "the drugs observed in the tan material [in the O'Brien bindle] were those that were observed in the postmortem blood of the decedent."

¶14     O'Brien's trial counsel testified as follows.  He had been a practicing criminal defense attorney for 37 years, and had previously worked on up to 10 cases involving reckless homicide by drug delivery.  In the course of representing O'Brien, counsel reviewed the lab reports, noticed the discrepancies, and specifically observed that cocaine and tramadol were present in the O'Brien bindle but not present in K.J.'s postmortem blood and urine.  Trial counsel was aware that the discrepancies presented "the possible argument that the substance that

---

[5] *See **State v. Machner***, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).  A ***Machner*** hearing is "[t]he evidentiary hearing to evaluate counsel's effectiveness, which includes counsel's testimony to explain his or her handling of the case." ***State v. Balliette***, 2011 WI 79, ¶31, 336 Wis. 2d 358, 805 N.W.2d 334.

[O'Brien] delivered to [K.J.] was not a substantial factor in causing [her] death," and he gave that theory of the defense significant consideration because "it was the only defense we had." Counsel pursued this defense theory by discussing it with the prosecutor and by consulting with a toxicologist he had used in prior cases. Had O'Brien decided to go to trial, counsel would have hired a toxicologist to testify for the defense.

¶15 Trial counsel further testified that he told O'Brien about the discrepancies in the lab reports and that they "talked about [a defense based on those discrepancies] several times." Counsel testified to a particular conversation in which he and O'Brien discussed whether O'Brien should enter a plea or go to trial with the defense. In this conversation, counsel advised O'Brien about the strengths and weaknesses of the defense, as well as the likely outcomes, including likely sentencing ranges, of pleading no contest.

¶16 Trial counsel testified that, in his assessment, a defense based on the drug discrepancies was unlikely to succeed at trial. The State's case against O'Brien was strong. The State had video footage of O'Brien meeting K.J. in the Portage Walmart parking lot, O'Brien admitted that he sold K.J. drugs on those two separate occasions, and, at trial, the State would be able to introduce a letter O'Brien had written expressing responsibility and remorse over her death.

¶17 Trial counsel also perceived several weaknesses with a defense premised on the drug discrepancies.

¶18 First, counsel testified that, based on his experience, a "substantial factor" defense was a "tough defense for a lay jury to agree with."

¶19 Second, counsel was aware that black market drugs are not always consistently processed. Therefore, the State would be able to argue at trial that black market drugs can be inconsistent between various batches, and can also contain inconsistencies within a single batch. Accordingly, despite the discrepancies, a jury could nonetheless conclude that the drugs found in K.J.'s blood and urine came from the same batch of drugs as those in the O'Brien bindle found in K.J.'s purse.

¶20 Third, O'Brien delivered K.J. drugs on two separate occasions. As such, O'Brien could have sold K.J. two different batches of drugs—one batch that K.J. consumed and died from that did not contain cocaine and tramadol, and a second batch that she had not yet consumed which contained cocaine and tramadol and was found in the O'Brien bindle. Counsel explained how this fact weakened the potential defense as follows:

> Since you're killed by the drugs you use, and not by the drugs you don't use, the bindle represents the drugs that [K.J.] did not use. And the urine and blood samples represent the drugs that she did use. Both could have come from the same bindle or from separate bindles.
>
> Of course, that wouldn't have been my argument to the jury. You know, the defense would have been the drugs came from someone else.

¶21 Finally, counsel concluded that it was unlikely that K.J. had purchased drugs from someone other than O'Brien between September 1, 2018, and her death. At the time she died, K.J. still had one bindle that she had obtained from O'Brien in her possession. Under the circumstances, counsel discounted the likelihood that a jury would find that she might have taken the initiative to obtain more drugs from a third party. And, counsel had no evidence to present at trial suggesting that K.J. had purchased drugs from anyone other than O'Brien.

¶22     O'Brien also testified, providing somewhat inconsistent accounts as to whether and to what extent trial counsel advised him about a potential defense based on the drug discrepancies.  On direct and cross-examination, O'Brien testified that counsel discussed the lab reports with him, but that counsel did not discuss the potential rebuttals by the State to a discrepancy-based defense and "really didn't go into detail too much about anything with me."  However, on re-direct, O'Brien testified that counsel never talked to him about the discrepancies in the lab reports, or that he could not recall whether counsel had done so.  O'Brien also testified that counsel told him that he would hire a toxicologist to look into the drug discrepancies, but on cross-examination, O'Brien conceded that it was possible counsel had said that he would "consult" with, as opposed to "hire," a toxicologist.

¶23     At the close of the hearing, the circuit court determined that trial counsel's performance was not constitutionally deficient.  It found, among other things, that counsel had reviewed the lab reports, recognized the discrepancies between the drugs in the lab reports, recognized a potential discrepancy-based defense, investigated the viability of that defense by consulting with a toxicologist, and seriously considered its viability before a jury.  Further, the court found that counsel had spoken with O'Brien about the discrepancies between the lab reports, as well as the defense based on those discrepancies, and that counsel had adequately advised O'Brien of the advantages and disadvantages of entering a plea.  The court concluded that counsel's advice to O'Brien, which reflected counsel's strategic judgment that the defense would not likely succeed, was reasonable.  The court considered the opinion of O'Brien's postconviction toxicologist—that it was not possible as a matter of medical science to determine which drug caused K.J.'s death—and concluded "[t]hat doesn't mean that

[O'Brien's drugs] can't be a substantial factor in the contribution to the death." The court ultimately determined that O'Brien decided to enter a plea "rather than to prepare for trial and present competing toxicology reports." O'Brien appeals.

## DISCUSSION

¶24 "A defendant is entitled to withdraw a plea after sentencing only upon a showing of 'manifest injustice' by clear and convincing evidence." *State v. Bentley*, 201 Wis. 2d 303, 311, 548 N.W.2d 50 (1996) (quoted source omitted); *State v. Krieger*, 163 Wis. 2d 241, 249, 471 N.W.2d 599 (Ct. App. 1991). One way a defendant can demonstrate a manifest injustice is to establish that the defendant received ineffective assistance of counsel. *State v. Dillard*, 2014 WI 123, ¶84, 358 Wis. 2d 543, 859 N.W.2d 44; *State v. Howell*, 2007 WI 75, ¶¶73-74, 301 Wis. 2d 350, 734 N.W.2d 48.

¶25 Ineffective assistance of counsel claims are rooted in the United States and Wisconsin constitutions, both of which guarantee criminal defendants the right to effective assistance of counsel at "'critical stages of criminal proceedings,'" including when a defendant enters a guilty plea. *See State v. Savage*, 2020 WI 93, ¶27, 395 Wis. 2d 1, 951 N.W.2d 838 (quoted source omitted) (citing U.S. CONST. amend. VI.); *see also* WIS. CONST. art. I, § 7.

¶26 To prevail on a claim of ineffective assistance of counsel, a defendant has the burden to prove that trial counsel's performance was deficient, and also, that the deficiency prejudiced the defendant. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To prove deficient performance, the defendant must show that his counsel's representation "fell below an objective standard of reasonableness." *Id.* at 688. To prove prejudice, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the

result of the proceeding would have been different." *Id.* at 694. In the context of a plea agreement, the defendant must show that there is a reasonable probability that, but for counsel's deficient performance, the defendant would have gone to trial instead of entering a plea. *See Dillard*, 358 Wis. 2d 543, ¶¶95-96. We need not address both deficient performance and prejudice if the defendant makes an insufficient showing on one. *State v. Maloney*, 2005 WI 74, ¶14, 281 Wis. 2d 595, 698 N.W.2d 583 (citing *Strickland*, 466 U.S. at 697).

¶27 Appellate review of an ineffective assistance of counsel claim presents a mixed question of law and fact. *State v. Dalton*, 2018 WI 85, ¶33, 383 Wis. 2d 147, 914 N.W.2d 120. The circuit court's findings of fact will not be disturbed unless clearly erroneous. *Id.* However, whether counsel's performance was deficient and prejudicial are both questions of law that we review de novo. *See State v. Pitsch*, 124 Wis. 2d 628, 634, 369 N.W.2d 711 (1985).

¶28 On appeal, O'Brien asserts that his trial counsel provided constitutionally ineffective assistance and that he is entitled to withdraw his plea. O'Brien's primary arguments about deficiency fall into two categories: first, that his counsel failed to sufficiently investigate the viability of a potential defense based on the drug discrepancies; and second, that his counsel failed to advise O'Brien that the defense was compelling or as to the advantages and disadvantages of the plea agreement in light of that defense. We address these alleged deficiencies in turn and, because we conclude that trial counsel was not deficient in either respect, we do not reach O'Brien's arguments about prejudice.

¶29 O'Brien contends that his counsel performed deficiently by failing to review and "investigate[] the lab results more thoroughly." A failure to review discovery, or to investigate potential defenses, can constitute deficient

performance. *See* **Porter v. McCollum**, 558 U.S. 30, 39-40 (2009) (failure to conduct a thorough investigation into the defendant's background can constitute deficient performance); **State v. Thiel**, 2003 WI 111, ¶¶37, 50, 264 Wis. 2d 571, 665 N.W.2d 305 (failure to review and investigate portions of discovery constitutes deficient performance). Here, however, the circuit court found that counsel reviewed the lab reports, discovered the drug discrepancies, and investigated the discrepancies by consulting with a toxicologist. It found that, based on his investigation, counsel recognized that O'Brien might be able to raise a discrepancy-based defense, and that counsel gave the defense significant consideration. O'Brien does not argue that any of these findings are clearly erroneous.[6]

¶30 Instead, O'Brien argues that trial counsel's investigative efforts were insufficient. He contends that a reasonable attorney would have investigated the lab results "more thoroughly," but O'Brien does not specify the ways in which counsel's investigation was lacking. His argument appears to be based on the premise that, rather than merely consulting with a toxicologist, counsel should have hired a toxicologist and obtained an independent report from the toxicologist prior to advising O'Brien on whether to take a plea deal. We disagree for reasons we now explain.

¶31 A defendant who alleges ineffective assistance of counsel based on trial counsel's failure to investigate "'must allege with specificity what the

---

[6] At times in his appellate briefing, O'Brien attempts to instill doubt about whether trial counsel actually consulted with a toxicologist about the facts of his case. However, O'Brien does not develop an argument that the circuit court's finding on this point is clearly erroneous, and we address the subject no further.

investigation would have revealed.'" *See Thiel*, 264 Wis. 2d 571, ¶44 (quoting *State v. Leighton*, 2000 WI App 156, ¶38, 237 Wis. 2d 709, 616 N.W.2d 126). Here, however, O'Brien does not identify anything of evidentiary value that an independent report would have revealed that his counsel did not already discover on his own, or through his consultation with a toxicologist. Trial counsel was aware of the drug discrepancies and, as shown above, the toxicologist O'Brien retained postconviction did not provide any further insight into those discrepancies beyond what was already known by counsel.

¶32 The only new insight O'Brien's toxicologist provided was the opinion that it was not possible as a matter of medical science to determine whether K.J. consumed and died from the drugs in the O'Brien bindle. O'Brien does not explain how that opinion would have bolstered the viability of a discrepancy-based defense. If anything, the toxicologist's opinion—that it was not possible to state one way or another whether the drugs found in the O'Brien bindle were those observed in K.J.'s postmortem blood—helps to illustrate the limitations of any such defense.

¶33 We now turn to O'Brien's various arguments about whether counsel failed to sufficiently advise, or misadvised, O'Brien.

¶34 O'Brien first contends that trial counsel performed deficiently by failing to provide him with more detailed information about the lab reports and more thorough advice about a potential defense based on the discrepancies.[7] This

---

[7] In his appellate briefing, O'Brien asserts that "[trial counsel] told the circuit court that he did not go into detail with O'Brien about the potential defense that the report presented." However, to support this assertion, O'Brien cites to his own testimony at the *Machner* hearing, and not to any testimony by trial counsel. We have not found any such admission by trial counsel

(continued)

argument fails because O'Brien does not identify any information or opinion that his counsel failed to convey. At best, O'Brien suggests that counsel should have advised him of "the significance of the lab reports." However, the circuit court found that counsel informed O'Brien of the drug discrepancies in the lab reports, and that counsel informed O'Brien that the discrepancies could be used to argue that the drugs O'Brien sold to K.J. were not a substantial factor in causing her death. O'Brien does not argue that these findings are clearly erroneous and, to the extent the lab reports were significant in any other regard, O'Brien has not explained how.

¶35 Second, O'Brien contends that counsel performed deficiently by failing to advise him that a discrepancy-based defense was "convincing" and would create "reasonable doubt." However, O'Brien has not persuaded us that counsel's assessment of the defense was objectively unreasonable or wrong, or that a discrepancy-based defense would be convincing at trial. *Cf.* ***Dillard***, 358 Wis. 2d 543, ¶93 (counsel's advice to enter no-contest plea was based on an erroneous application of statute and constituted deficient performance). As discussed above, counsel provided detailed testimony at the ***Machner*** hearing explaining his assessment that a defense based on the drug discrepancies was unlikely to succeed at creating reasonable doubt. And on appeal, O'Brien does not offer any substantive arguments to show that counsel's assessment was unreasonable.

---

in the hearing transcript, and we caution O'Brien's appellate counsel to use greater care to ensure the accuracy of her representations about the record.

¶36 Finally, O'Brien asserts that counsel "failed to inform him of the advantages and disadvantages of the plea agreement." "A defendant's decision whether to go to trial or plead no contest … is generally the most important decision to be made in a criminal case," and "[a] defendant should have the benefit of an attorney's advice on that crucial decision." ***Dillard***, 358 Wis. 2d 543, ¶90. Once again, however, O'Brien fails to identify any advantages or disadvantages that counsel failed to convey to him. Based on the facts as found by the circuit court, we conclude that counsel provided an objectively reasonable assessment.

## CONCLUSION

¶37 For all of these reasons, we conclude that O'Brien has not met his burden to prove that his trial counsel's performance was deficient, and accordingly, that O'Brien is not entitled to withdraw his plea.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.